1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10   FELIX CRUZ MARTINEZ,                    )      1:06-CV-00656 AWI JMD HC
                                            )
11              Petitioner,                 )
                                            )
12        v.                                )      FINDINGS AND RECOMMENDATION
                                            )      REGARDING PETITION FOR WRIT OF
13   WARDEN L.E. SCRIBER,                    )      HABEAS CORPUS
                                            )
14              Respondent.                  )
     _____    )
15

16        Petitioner Felix Cruz Martinez ("Petitioner") is a state prisoner proceeding pro se with a

17   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

18                            **PROCEDURAL BACKGROUND**

19        Petitioner is currently in the custody of the California Department of Corrections and

20   Rehabilitation in accordance with a judgement of the Kern County Superior Court.  (Answer at 2).

21   On December 18, 2002, Petitioner was convicted by a jury of attempted murder (Cal. Penal Code §

22   644/187(a)), solicitation to commit murder (Cal. Penal Code § 653(f)/187/664, 189), conspiracy to

23   commit murder (Cal. Penal Code §182(a)(1)), three counts of premeditated murder (Cal. Penal Code

24   § 187(a), and assault with a deadly weapon (Cal. Penal Code § 245(a)(2)).  (Id).  Petitioner was also

25   charged and convicted of two counts of witness dissuasion (Cal. Penal Code §136.1(a)(2)).  (Id).

26   Petitioner was sentenced to fifty years-to-life for the first degree murder conviction, two life terms

27   for the attempted murder convictions, and seventeen years-to-life for the assault conviction.  (Id).

28        Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District

1  on July 15, 2004.  (Lod. Doc. 2).  The appellate court reversed Petitioner's conviction for one count

2  of witness dissuasion and struck a ten year sentence enhancement but otherwise affirmed the

3  judgement in an reasoned opinion issued on September 1, 2005.  (Answer at 2; Lod. Doc. 3).

4  Petitioner filed a petition for rehearing before the California Court of Appeal on October 4, 2005.

5  (Lod. Doc. 4).  The state appellate court denied the petition for rehearing on October 13, 2005.  (Lod.

6  Doc. 5).

7        Petitioner subsequently submitted a petition for review to exhaust state remedies to the

8  California Supreme Court on November 1, 2005.  (Lod. Doc. 6).  The California Supreme Court

9  summarily denied the petition for review.  (Lod. Doc. 7).

10       On May 30, 2006, Petitioner filed this instant federal petition for habeas corpus relief.  The

11 petition sets forth eight grounds for relief: (1) the trial court's admission of a witness' coerced

12 statements were a violation of his right to due process of the law; (2) the trial court's admission of

13 hearsay violated Petitioner's rights under the Confrontation Clause; (3) prosecutorial misconduct and

14 ineffective assistance of counsel relating to continued questioning of a witness who refused to testify;

15 (4) improper jury instruction permitted jury to consider the flight of others in determining

16 Petitioner's guilt and trial counsel was ineffective in failing to object on those grounds with regards

17 to the jury instruction; (5) the trial court erred in refusing to issue jury instruction on coercion with

18 regards to witnesses' statements; (6) cumulative affective of the errors denied Petitioner's due

19 process of the law;  (7) the record contains insufficient evidence to support appellant's conviction for

20 witness dissuasion on count seven and eight; and (8) various sentencing errors Petitioner alleges the

21 trial court committed.

22       On June 4, 2007, Respondent filed an answer to the petition.

23       On July 5, 2007, Petitioner filed a response to Respondent's reply.

24                              **FACTUAL BACKGROUND**[1]

25       On August 13, 2000, Martinez, a member of the Gage Street criminal street
   gang, was shot five times as he sat in his parked vehicle. The police believed
26   Martinez was shot in retaliation for the murder of a member of the Los Primos

27

28 _____

[1]The facts are derived from the factual and procedural summary set forth by the Fifth DCA in its unpublished opinion issued on September 21, 2005, and are presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner is referred therein as Martinez.

criminal street gang that had occurred three days earlier. Martinez stated he could not identify the shooters, and at one point told an officer he would take care of it himself.

On August 9, 2001, Elena Espinoza, her brothers, Miguel and Manuel Espinoza, and Elena's 14-month-old daughter, Gloria Vasquez, were driving in Eliseo Vasquez's car. Eliseo Vasquez, known as Chevo, is Gloria's father and was a member of the Los Primos criminal street gang. Francisco Espinoza, known as Pancho, was Elena's brother and also a member of the Los Primos criminal street gang.

Witnesses saw Elena driving at a high rate of speed followed by another car. The trailing car caught up with Elena. Shots were fired. Elena, Miguel, and Manuel were killed. Gloria survived, despite being shot once in the abdomen.

The prosecution's case depended on connecting Martinez with the homicides, even though no witness could identify the perpetrators. The prosecution argued the murders occurred in retaliation for Martinez having been shot one year earlier. The prosecution relied on two theories to support its argument. The first theory was that Martinez was present at, and participated in, the murders. The second theory was that Martinez ordered the murders, which were carried out by other members of the Gage Street criminal street gang. Both theories were based on the belief that Elena, Miguel, and Manuel were not the intended targets. Instead, they became victims because they were driving Chevo's car.

To support the first theory, the prosecution relied primarily on three witnesses. The first witness was Jorge Ramirez. Ramirez testified at trial that he did not see anything the night of the shootings, and the statement he gave to officers was information relayed to him by others who saw the shootings.

Officer Damacio Diaz interviewed Ramirez in the field and acted as an interpreter during Ramirez's interview with the investigating officers. Diaz testified that Ramirez gave the following detailed description of the events on the night of the murders. Ramirez was standing in his front yard when he heard shots fired. He ran towards the direction of the shots and saw three cars racing down the street, the victims' car followed by two other cars. One of these cars was a small, dark blue, early 1980's, two-door compact car. Ramirez described the other two vehicles, stated the two vehicles chasing the victims' vehicle each contained several Mexican males and, when the victims' vehicle came to a stop, one man from the blue vehicle got out, obtained a handgun from the other vehicle, and fired at the occupants of the victims' vehicle at close range.

Ramirez was not able to identify any of the individuals, but identified Martinez's car as the blue car he had seen at the scene. The interview with Ramirez was taped and the tape was played for the jury.

The second witness on whom the prosecution relied to support the theory that Martinez was at the scene was Jason David Nawrot. Nawrot was inside his house when he heard "pops" and the sound of a racing engine. He looked out his window and saw a car go by. He later identified the car as the victims' car. On the night of the murders, he described the car as a newer model Ford Escort with metallic royal blue paint. The victims' car was painted with gray primer. Martinez owned a royal blue Geo.

The third witness on whom the prosecution relied to support the theory that Martinez was at the scene was Martinez's neighbor, Rondell Wilson. Wilson testified that on the night of the shootings he saw Martinez drive his blue Geo away from his house. He also testified that Martinez stopped as he passed by and asked Wilson to page him if he saw anything unusual occurring at his home because he had just "smoke[d] these [or three] fools."

Abraham "Pops" Rodriguez, Jr., was a critical witness for the prosecution on both theories of responsibility. Rodriguez was a member of the Gage Street criminal street gang and had known Martinez since grade school. The prosecution provided Rodriguez with immunity pursuant to section 1324.

At trial Rodriguez testified that on the night of the murders he was with Martinez, Jillian Eggenberg, and Courtney Dawn Robinson. They spent that evening

1  and other evenings together that week. Rodriguez provided a detailed description of the night's events. Rodriguez did not see Martinez after that night.

2  Rodriguez also gave two recorded statements to the police, each of which differed significantly from the trial testimony. Each of the recorded statements implicated Martinez in the murders. Recordings of these statements were played to the jury. As the admissibility of these statements is the subject of the issue discussed in part I., we will defer a detailed description of the contents of the statements to that discussion.

5  Rodriguez also explained during trial why he had disappeared for almost a year after the murders. After his second recorded interview, Rodriguez was taken to a hotel paid for by the police. The officers told Rodriguez his safety was in jeopardy. Rodriguez said he could go to San Diego. The officer replied that he should go and not come back. Rodriguez spent one month in San Diego and then went to Mexico for nearly a year. He was arrested crossing the border from Mexico to San Diego.

8  The prosecution presented evidence linking Jose Onsurez to the murders. Onsurez was a member of the Gage Street criminal street gang. Daniel Montantes testified that he was not involved in the murders but told an officer during the investigation that he saw Onsurez with a handgun and a rifle prior to the shootings.

10  Michael DeLeon received a favorable plea bargain from the prosecution and was placed in a witness protection program. He testified he was a member of the Loma Baker criminal street gang and associated with Martinez. He described several meetings that were attended by both Loma Baker and Gage Street gang members. Martinez was in charge of the meetings. DeLeon denied any involvement in the shootings.

13  Onsurez showed DeLeon some guns he had in his possession. One of them was described as an M-1 military style rifle, the same type of rifle used in the murders.

14  DeLeon testified that on the night of the murders Onsurez called and asked DeLeon to come to his house. When he arrived Montantes and another unidentified male were with Onsurez. Onsurez told DeLeon that he and Montantes had just killed some Los Primos gang members. Onsurez said they were looking for Pancho but found some other Los Primos in Chevo's car. Onsurez said he emptied the clips in both rifles.

18  DeLeon saw Montantes pull the two rifles out of the car, put them in a blanket, and hide them in a vent under the apartment occupied by Jullie May Schertz. While Montantes was hiding the guns, DeLeon and Onsurez knocked on the door to Schertz's apartment and asked to speak to her boyfriend, Joseph Arthur Hernandez. Schertz answered the door and saw DeLeon unscrewing the porch lightbulb. DeLeon told Schertz to go back inside and not to worry about anything.

21  DeLeon helped Onsurez and his family move the next day because some members of the Los Primos criminal street gang told Onsurez's sister they knew Onsurez was the shooter and they were going to seek revenge.

22  John Moreno, Onsurez's brother, told DeLeon that he had thrown the rifles in the river that runs behind Hart Park. DeLeon was driving with Moreno when Moreno asked DeLeon to throw some bullets out of the car. DeLeon showed the officers where he disposed of the bullets. A few bullets were recovered.

24  Schertz testified about the incident with DeLeon and Onsurez the night of the murders. She further testified she saw Moreno and another man loading a bag into Moreno's jeep the day after the murders.

25  The prosecution also played excerpts from numerous phone calls made by Martinez while he was incarcerated and excerpts of phone calls involving Rodriguez while he was eluding police officers in Mexico and San Diego.

27  Finally, the prosecution presented Officer Martin Heredia as an expert on criminal street gangs. Heredia testified that (1) Gage Street was a criminal street gang; (2) various individuals, including Martinez, were members of either Loma Bakers, Los Primos, or Gage Street criminal street gangs; and (3), based on a hypothetical

question, the murders were performed in furtherance of the gang. Heredia did not believe the victims were members of a gang.

Martinez testified on his own behalf in an attempt to establish an alibi and also relied on the testimony of Robinson and Eggenberg. Martinez denied any involvement in the shootings.

Martinez was charged with three counts of first degree murder (§ 187, subd. (a)) (counts 1-3); one count of attempted murder (§§ 664, 187, subd. (a)) (count 4); conspiracy to commit murder (§ 182, subd. (a)(1)) (count 5); solicitation of murder (§ 653f, subd. (b)) (count 6); and two counts of attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2)) (counts 7 and 8). Each count also alleged the crime was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) Counts 1 through 5 also alleged Martinez personally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d). Counts 1 through 3 also alleged the special circumstance of multiple murder. (§ 190.2, subd. (a)(3).)

The jury returned guilty verdicts on all counts and found true all enhancement allegations. The jury found Martinez did not personally discharge a firearm in counts 1 through 5, but instead found him vicariously liable because the crimes were committed in furtherance of a criminal street gang. In addition, the jury did not find true any overt act alleged that indicated there were two vehicles in addition to the victims' vehicle involved in the shootings. Therefore, it appears the jury concluded that Martinez was not present at the scene of the crime but that he ordered the murders.

(Lod. Doc. 3 at 2-7)

## DISCUSSION

## I.   Jurisdiction

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  A habeas "application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d).   Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  Petitioner's custody arises from a conviction in the Kern County Superior Court and Petitioner is currently incarcerated at California State Prison, Corcoran in Kings County.  As the Eastern District of California includes both Kern and Kings County, this court has jurisdiction over the instant action. *See* 28 U.S.C. § 84(b).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

1  (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>, 97

2  F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

3  <u>Lindh</u>, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

4  instant petition was filed on August 10, 2005 and is consequently governed by the provisions of the

5  AEDPA, which became effective April 24, 1996.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003).

6  **II.    Legal Standard of Review**

7          This Court may entertain a petition for a writ of habeas corpus by "a person in custody

8  pursuant to the judgment of a state court only on the ground that he is in custody in violation of the

9  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10         Since Petitioner filed his petition after the effective date of AEDPA, his petition for habeas

11  corpus "may be granted only if he demonstrates that the state court decision denying relief was

12  "contrary to, or involved an unreasonable application of, clearly established Federal law, as

13  determined by the Supreme Court of the United States.""  <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir.

14  2007) (quoting 28 U.S.C. § 2254(d)(1)); *see* <u>Lockyer</u>, 538 U.S. at 70-71.

15         As a threshold matter, this Court must "first decide what constitutes 'clearly established

16  Federal law, as determined by the Supreme Court of the United States.'"  <u>Lockyer</u>, 538 U.S. at 71

17  (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

18  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

19  the time of the relevant state-court decision." <u>Id</u>. (quoting <u>Williams</u>, 592 U.S. at 412). "In other

20  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

21  principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.

22         Finally, this Court must consider whether the state court's decision was "contrary to, or

23  involved an unreasonable application of, clearly established Federal law."  <u>Lockyer</u>, 538 U.S. at 72,

24  (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

25  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

26  question of law or if the state court decides a case differently than [the] Court has on a set of

27  materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 413; *see also* <u>Lockyer</u>, 538 U.S. at 72.

28  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).  Furthermore, this court is bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied, 537 U.S. 859, 123 S.Ct. 231 (2002), rehearing denied, 537 U.S. 1149, 123 S.Ct. 955 (2003).

## III.     Review of Petitioner's Claim

### A.       Ground One

As his first ground for relief, Petitioner contends that the trial court's admission of Rodriguez's statements to the police violated his right to due process of the law as Rodriguez's testimony was coerced.  This claim was presented to the state appellate court, the last court to issue a reasoned opinion in this case.  The state supreme court denied the petition without comment.  As the California Supreme Court's opinion is summary in nature, this Court looks through that decision and presumes that by its "silent order" denying the petition, the California Supreme Court denied the claims presented for the same reasons stated in the lower court's opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

1

*1.   Harmless Error Analysis Regarding First Interview*

2       The California Court of Appeal found that regardless of whether the first interview was

3 coerced, the admission of statements from the first interview was harmless beyond a reasonable

4 doubt, pursuant to the standard articulated in Chapman v. California, 386 U.S. 18 (1967).  (Lod. Doc.

5 3 at 24).  The state appellate court utilized the correct standard in determining whether a coerced

6 confession would require reversal of the conviction.  *See* Inthavong v. Lamarque, 420 F.3d 1055,

7 1058 (9th Cir. 2005); *see also* Arizona v. Fulimante, 409 U.S. 279, 306-312 (1991) (applying the

8 Chapman harmless error analysis to a coerced confession in holding that such error does not require

9 automatic reversal)).  If a state court applied the appropriate standard of review in disposing of a

10 constitutional error as harmless, the dispositive inquiry before the federal habeas court is whether the

11 state court's harmless error analysis was objectively unreasonable.  Medina v. Hornung, 386 F.3d

12 872, 878 (9th Cir. 2004).  The state appellate court ruling that the admission of a coerced confession

13 was harmless is entitled to deference unless it conflicts with the reasoning or holdings contained in

14 Supreme Court precedents or if the state court's application of the harmless error standard was

15 objectively unreasonable.  Inthavong, 420 F.3d at 1058-1059 (citing Mitchell v. Esparza, 540 U.S.

16 12, 17-18 (2003) and Medina, 386 F.3d at 878-879).

17       Here, the Court of Appeal's harmless error analysis was not objectively unreasonable.  The

18 state court correctly stated and identified the Chapman harmless error standard made applicable in

19 Fulimante.  (Lod. Doc. 3 at 23-24).  The appellate court's analysis rested primarily on several factors

20 indicating that the jury gave no weight to the statements admitted from Rodriguez's first

21 interview–specifically focusing on the jury's special finding that Petitioner was not present at the

22 shootings and Rodriguez's constantly changing story in the first interview.  The court noted that the

23 jury's special finding indicated that they had not relied on the Rodriguez's statements in the first

24 interview as those statements supported the prosecution's alternative theory that Petitioner

25 participated in the shootings.  (Id. at 24). The court further pointed to the lack of credibility that the

26 jury would have given the first interview in light of the multiplicity of changes to Rodriguez's story

27 contained in that interview itself.  (Id. at 25).

28       Additional factors that rendered the first interview harmless in the opinion of the state

appellate court included the other evidence implicating Petitioner in the murders and the statements contained in the second interview. (Id. at 24-25).  Finding that the second interview was not coerced, the appellate court noted that the statements from the second interview contradicted the first interview.  However, the second interview was considerably more credible as it, unlike the first interview, contained a single version of events–namely that Petitioner orchestrated but did not participate in the shooting–and was corroborated by independent sources of evidence.  (Id. at 25). This version of events contained in the second interview was consistent with both the jury's special finding that Petitioner was not present, and the guilty verdict returned by the jury–thereby indicating that the jury found credible and gave consideration to the second interview but not the first. Considering the factors identified above, the Court finds that the appellate court's opinion was not objectively unreasonable in holding that the error was harmless as these factors clearly support the appellate court's finding that the jury's verdict was not impacted by the statements admitted from the first interview.

       *2.    Second Interview*

      The appellate court found that the second interview had not been coerced and that even assuming that the first interview had been coerced, there existed enough attenuation between the first and second interview that the second interview was untainted by the first interview. The state appellate court wrote that:

      The second interview was different. Three days after the first interrogation, the officers paged Rodriguez because they had received additional information and wanted to determine if Rodriguez could confirm or dispute the new information. Rodriguez returned the call and voluntarily came to the station. He was taken to one of the officers' desks instead of an interview room. He was not restrained during the interview.

      The recorded portion of the interview begins with a discussion about Onsurez, whose name, it is undisputed, first was brought up by Rodriguez. Rodriguez told the officers that Onsurez shot the victims so he would become a trusted member of the Gage Street criminal street gang. Rodriguez said Onsurez kept calling Rodriguez's apartment that night. Later Rodriguez said Onsurez was at his house with Martinez that night. Martinez received a page that night, called the number, and asked, "Where [are] the Primos?"

      The detectives decided to ask Rodriguez to tell his story from the beginning and discussed related information, such as Robinson, her relationship to Martinez, and Rodriguez's and Martinez's introduction into gang life. They proceeded to Martinez's request that Rodriguez shoot Pancho. Rodriguez said that Martinez asked him to accompany him to take out some Los Primos but Rodriguez refused, saying he did not want to get involved.

      Rodriguez admitted he lied when he said someone paged Martinez and

Martinez asked the other person to do something for him. Rodriguez said that on the night of the murders Martinez and Onsurez arrived at his apartment about 6:30 p.m. Martinez returned a page and had two conversations with the caller. As a result of these two calls, Martinez learned that Danny and Pancho of the Los Primos criminal street gang were on Water Street.

Onsurez was present during this conversation and stated he had a gun and would "do it." Onsurez, Rodriguez, and Martinez left in Martinez's car. Martinez and Rodriguez went cruising after dropping off Onsurez and then returned to Rodriguez's apartment. They arrived at Rodriguez's apartment about 10:00 p.m. Robinson and Eggenberg were waiting at the apartment. Rodriguez knew something was up but did not ask any questions because he did not want to get involved.

Rodriguez stated he and Martinez had gone to the cemetery and swimming with Robinson and Eggenberg, but that was in the days leading up to the night of the murders. Rodriguez said he lied in the previous interview because he was scared of going to jail and "everything." The day following the murders, Martinez asked Rodriguez if he had heard what happened. When Rodriguez said he had heard, Martinez laughed.

There were no threats or other conduct during this interrogation to suggest Rodriguez's statement was coerced. Martinez does not contend otherwise. Instead, he argues the coercion present in the first statement required suppression of the second statement.

"A subsequent confession is not the tainted product of the first merely because, 'but for' the improper police conduct, the subsequent confession would not have been obtained. [Citation.] ... '... Rather, the more apt question in such a case is "whether ... the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint ." ' [Citations.] The degree of attenuation that suffices to dissipate the taint 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. [Citations.]" ( People v. Sims (1993) 5 Cal.4th 405, 445.)

If we assume, without deciding, that the first interview should have been suppressed, the question is whether there is sufficient attenuation between the first and second interview to conclude a break in the causal chain occurred. The facts surrounding the second interview thus become important. Rodriguez admitted he volunteered additional information about Martinez, and he brought up Onsurez's name to the police. Rodriguez admitted he agreed to speak to officers again when they paged him. Rodriguez was handcuffed for the ride to the police station, but the handcuffs were removed when they exited the car. Rodriguez was taken to an office where he and two officers sat around a desk. Rodriguez stated he was threatened by the officers before and after the interview, but no threats appeared during the taped portion of the interview.

Detective Robert Heiduk was involved in the second interview. He stated that he and Detective Jeffrey Watts went to see Rodriguez at Rodriguez's apartment after they spoke with Robinson and Eggenberg. The detectives thought that Robinson and Eggenberg had manufactured an alibi for Martinez, and they wanted to know if Rodriguez could shed any light on the issue. The detectives began questioning Rodriguez about the events mentioned by Robinson and Eggenberg when Rodriguez brought up Onsurez. The officers did not bring any recording equipment with them because of the limited topics they intended to discuss. When Rodriguez volunteered new information, the detectives decided to transport Rodriguez to the police station to permit the interview to be recorded. Rodriguez said that he was afraid of retaliation from members of the Gage Street criminal street gang. Heiduk denied that Rodriguez had been threatened either before or after the interview. Rodriguez was the first person to suggest that Onsurez was responsible for killing the victims. Heiduk testified that Rodriguez identified the three Los Primos gang members referred to by

Martinez as Danny, Chevo, and Pancho.

We conclude the "causal chain" between the first and second confession was severed. We begin with Rodriguez's claims that he was threatened before and after the second interview. The trial court found there was no coercion, and this conclusion necessarily includes a finding that the officers did not threaten Rodriguez before or after the second interview. Since this conclusion is supported by substantial evidence, Heiduk's testimony, we accept this finding of fact.

It is significant that Heiduk and Watts went to see Rodriguez for a limited purpose, to verify or dispute Robinson's and Eggenberg's statements. Heiduk stated they intended to be there for only a few minutes to discuss this topic when Rodriguez began volunteering new information about the murders and named Onsurez as a participant for the first time. It is this new information about which Martinez complains, because it implicates him in the murders.

It also is significant that three days separated the two interviews without any other attempt by the police to interview Rodriguez. These factors convince us that the second interview was not tainted by the first interview, and the trial court did not err in admitting the tape and transcript of the second interview.

(Lod. Doc. 3 at 20-23).

The Court finds that the state court's conclusion, that the statements from the second interview were voluntary, was not an "unreasonable determination of the facts in light of the evidence presented" nor was it "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(2) and (1).  The appellate court's conclusion was based on both the lack of coercive elements in the second interview and the break in the causal chain linking the first and second interviews.

Egregious violations of a petitioner's constitutional rights in the first interview does not necessarily require suppression of statements elicited in the second interview. *See* Garvin v. Farmon, 258 F.3d 951, 954-955 (9th Cir. 2001).  As illustrated above, the state court's determination of voluntariness was reached after a careful analysis of the "significance of a break in the stream of events between prior coercion and subsequent admissions." Garvin, 258 F.3d at 957.  In Garvin, the Ninth Circuit found that clearly established federal law, pursuant to the Supreme Court's decision in Oregon v. Elstad, 470 U.S. 298 (1985) did not mandate suppression of a confession obtained in a second interview three days after constitutional violation occurred in the first interview.  Garvin, 258 F.3d at 956-958.  In Elstad, the Supreme Court rejected the "cat out of the bag" presumption applied by the state court in finding that second interview was automatically tainted by the constitutional violations of the first interview.  " Elstad, 470 U.S. at 303-304.  Here, the state court's determination was not an unreasonable application of clearly establish law as the state court carefully considered

1   the causal chain between the two interviews–noting the difference in tone, location, and the time

2   separating the two interviews.

3        In evaluating the voluntariness of statements made to law enforcement officials, the

4   dispositive inquiry is whether "considering the totality of the circumstances, the government

5   obtained the statement[s] by physical or psychological coercion or by improper inducement so that

6   the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir.

7   1988). "A statement is involuntary if it is extracted by any sorts of threats or violence, or obtained

8   by any direct or implied promises, however slight, or by the exertion of any improper influence." Id.

9   (Internal quotation marks omitted)(citing to Hutto v. Ross, 429 U.S. 28, 30 (1976)).

10        As noted by the appellate court, the second interview occurred at the desk of one of the

11   officers.  The officers did not threaten Rodriguez immediately prior to or after this interview.

12   Additionally, the transcript of the interview reveals that, unlike the previous encounter, there were no

13   threats of incarceration. (*See* CT, Vol. 6 at 1692-1718).  The second interview also lacked the

14   accusatory tone of the first interview, during which the officers repeatedly accused Rodriguez of

15   lying to them and prompting Rodriguez to change his story several times during the first interview.

16   While Rodriguez testified that the detectives threatened him during the second interview and

17   handcuffed him on the ride to the police station, the transcript did not support his testimony.  (RT. at

18   5129-5130, 5127).  The transcript of the second interview does not reveal any threats toward

19   Rodriguez whatsoever just the officers telling Rodriguez that he was "doing the right thing." (CT,

20   Vol. 6 at 1716).  Considering the totality of the circumstances surrounding the second interview, the

21   Court finds Petitioner has not established that the statements obtained in that interview were the

22   result of an overborne will.

23        Furthermore, assuming *arguendo* that Petitioner establishes that both or either of Rodriguez's

24   statements were coerced,  Petitioner lacks standing to challenge infringements of a third party's

25   (Rodriguez) constitutional rights pursuant to Rakas v. Illinois, 439 U.S. 128, 139-40 (1978). *See*

26   Williams v. Woodford, 384 F.3d 567, 593 (9th Cir. 2004) (stating that habeas petitioner, who

27   claimed that trial court's admission of witness' coerced testimony was improper, lacks standing to

28   complain about infringement of a witness' constitutional rights).  However, Petitioner is entitled to

1   habeas relief if the trial court's admission of Rodriguez's testimony rendered the trial so

2   fundamentally unfair as to violate Petitioner's right to due process.  *See* id. (citing Karis v. Calderon,

3   283 F.3d 1117, 1129 n. 5 (9th Cir. 2002) and Jeffries v. Blodgett, 988 F.2d 923, 934-35 (9th Cir.

4   1993)).  Confessions obtained illegally may be less reliable than voluntary ones and use of a coerced

5   confession at another's trial can violate due process.  Douglas v. Woodford, 316 F.3d 1079, 1092

6   (9th Cir. 2003); *see also* United States v. Mattison, 437 F.2d 84, 85 (9th Cir. 1970) (per curiam)

7   (citing Alderman v. United States, 394 U.S. 165, 171-176 (1969) and Byrd v. Comstock, 430 F.2d

8   937 (9th Cir. 1970)).

9        Petitioner was not deprived of a fundamentally fair trial as Rodriguez testified at trial about

10  his allegedly involuntary statements.  The subject of the allegedly coercive nature of the police

11  interview featured prominently in the prosecutor's direct examination of Rodriguez as he testified

12  that the police pressured him so much that Rodriguez "just told him what he wanted to hear."  (RT,

13  Vol. 18, at 5111).  Rodriguez testified that the detectives threatened him during the second interview

14  (Id. at 5129-5130) and that he was "scared" during the interview.  (Id. at 5133).  Rodriguez further

15  reiterated that his statements from the first interview were a result of police pressure, pointing

16  specifically to their allegations during the interview that Rodriguez was lying to them. (Id. at 5110,

17  5114, and 5116).  During his cross examination of Rodriguez, Petitioner questioned Rodriguez about

18  the alleged coercion, eliciting from Rodriguez testimony that he was in a state of panic during the

19  interviews.  (Id. at 5224-5225).  In sum, Rodriguez's testimony during the trial disavowed his

20  statements during the police interview as a product of coercion, pressure, and his panic/fear,

21  explaining that he was so scared that he implicated Martinez.  (Id at 5133).  In light of such

22  testimony, the Court does not find that admission of Rodriguez's statements, even if coerced,

23  rendered the trial fundamentally unfair.  *See* Williams, 384 F.3d at 596 (finding no evidence that

24  petitioner's right to a fair trial have been violated where witness who was beaten at the city jail was

25  available for cross-examination about the coercion therefore allowing the petitioner "to test the

26  voluntariness and veracity" of the witness' testimony at trial); Mattison, 437 F.2d at 85 (holding no

27  violation of due process where witness, previously interrogated illegally, was subject to

28  cross-examination at trial through which the jury could assess the witness's credibility).

1    **B.    Ground Two, Three, and Eight**

2        In his second ground for relief, Petitioner alleges that the admission of hearsay testimony by

3    unidentified witnesses violated his rights under the Confrontation Clause.  Petitioner's third ground

4    for relief is prosecutorial misconduct, ineffective assistance of counsel, and trial court error in

5    permitting prosecutor to continue to question a witness, who invoked his Fifth Amendment right

6    against self-incrimination in refusing to testify.  The petition's eighth ground for relief encompasses

7    various sentencing errors Petitioner alleges the trial court committed.

8        These claims were presented, in an appeal, to the California Court of Appeal, which affirmed

9    the relevant portion of the judgment with the exception of a sentencing enhancement pursuant to

10   California Penal Code § 186.22(b) on September 21, 2005.  (*See* Lod. Doc. 2 and 3)  These issues

11   were not, however, raised in the petition for review to the California Supreme Court.  (Lod. Doc. 6.)

12       "A federal court has the authority to review a federal constitutional claim presented by a state

13   prisoner if available state remedies have been exhausted.  If state remedies have not been exhausted,

14   a district court must dismiss a petition filed pursuant to section 2254.  If a federal constitutional

15   claim can no longer be raised because of a failure to follow the prescribed procedure for presenting

16   such an issue, however, the claim is procedurally barred and the petition must be denied."  Johnson

17   v. Lewis, 929 F.2d 460, 463 (9th Cir. 1991) (citations omitted); O'Sullivan v. Boerckel, 526 U.S.

18   838, 848-49 (1999) (finding claims procedurally defaulted where they were presented to the state

19   intermediate appellate court, but not included in a petition for discretionary review to the state

20   supreme court).

21       Here, Petitioner's claims regarding the admission of hearsay testimony, prosecutorial

22   misconduct, and sentencing error are procedurally defaulted because he raised them on direct review

23   to the Court of Appeal but failed to present them on direct appeal to the California Supreme Court

24   within the time allowed.  More importantly, Petitioner can no longer raise the claims in the

25   California Supreme Court, as he cannot renew claims actually denied on direct review in a petition

26   for writ of habeas corpus.  Cal. Rules of Court, Rule 8.500(e)(1) ("A petition for review must be

27   served and filed within 10 days after the Court of Appeal decision is final in that court under rule

28   8.264."); *see* In re Waltreus, 62 Cal.2d 218, 225 (Cal. 1965) ("[H]abeas corpus ordinarily cannot

1   serve as a second appeal."); Forrest v. Vasquez, 75 F.3d 562, 563-64 (9th Cir. 1996) (finding claim

2   procedurally defaulted because it was not presented to the California Supreme Court on direct review

3   after being raised in the Court of Appeal and because Waltreus prohibits state habeas review of a

4   claim raised during the direct appeal process).

5          **C.**     **Ground Four**

6          As his fourth ground for relief, Petitioner alleges that the trial court's issuance of California

7   Jury Instruction ("CALJIC") No. 2.52 resulted in a violation of his rights as it permitted the jury to

8   consider the flight of others as evidence of Petitioner's guilt.  Petitioner also contends that his trial

9   counsel's failure to object to the instruction on those specific grounds constitutes ineffective

10  assistance of counsel.

11         *1.*     *Jury Instruction*

12         The state appellate court rejected Petitioner's claim that the issuance of the flight instruction

13  violated his right.  The state supreme court denied the petition without comment.  As the California

14  Supreme Court's opinion is summary in nature, this Court looks through that decision and presumes

15  that by its "silent order" denying the petition, the California Supreme Court denied the claims

16  presented for the same reasons stated in the lower court's opinion.  Ylst v. Nunnemaker, 501 U.S.

17  797, 803 (1991).  In rejecting the claim, the state court first noted that there existed sufficient

18  evidence to warrant the trial court's issuance of CALJIC No. 2.52.  CALJIC No. 2.52 as issued by

19  the trial court to the jury stated:

20             The flight of a person immediately after the commission of a crime or after he
         is accused of a crime in not sufficient in itself to establish his guilt but is a fact which,
21       if proved, may be considered by you in light of all other proved–proved facts in
         deciding whether a defendant is guilty or not guilty.  The weight to which this
22       circumstance is entitled is a matter for you to decide.

23  (RT, Vol. 28, at 8104-8105)

24         The state court noted that evidence that Petitioner acted to avoid arrest had been presented at

25  trial–including not answering the door when officers approached his apartment and going to the Los

26  Angeles area a few days later.  (Lod. Doc. 3 at 30).  Further, the appellate court found that it was

27  inconceivable that a reasonable juror could interpret the instruction to permit consideration of

28  another person's flight in determining Petitioner's guilt.  (Id.)

As a preliminary matter, the court notes that an allegation that a jury instruction is incorrect under state law does generally not form a basis for federal habeas corpus relief.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas  corpus relief does not lie for errors of state law").  A habeas court must not merely consider whether an "instruction is undesirable, erroneous, or even universally condemned," but rather, the court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)).  Even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  California v. Roy, 519 U.S. 2, 5 (1996) (finding that habeas challenges to the trial court's jury instructions is reviewed under the Brecht standard-namely whether the error had a substantial and injurious effect or influence in determining the jury's verdict).  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Cupp, 414 U.S. at 146-47).

Contrary to the argument Petitioner made before the appellate court, the jury instruction, as issued by the trial court, did not permit the jury to consider the flight of others in their determination of Petitioner's guilt.  (See Lod. Doc. 2 at ).  In accordance with the state appellate court, the Court finds that Petitioner's contention must fail as the plain language of the given instruction does not permit a finding of guilt based on the flight of others.  Rather, the language of the instruction makes it clear that the jury was permitted to consider the flight of the defendant.  Additionally, the jury instruction regarding Petitioner's flight was warranted by the evidence admitted at the trial–specifically, evidence that Petitioner pretended not to be at home in an attempt to evade answering questions from the police when they came to his house, that he abandoned his cars and wallet in Bakersfield, and that he left for Los Angeles only a couple of days later.

More importantly, the jury was explicitly instructed that such evidence is not sufficient by itself to prove Petitioner's guilt and consequently, Martinez cannot show that the instruction was

1   applied in a manner that violated his constitutional rights.  *See* <u>Carriger v. Lewis</u>, 971 F.2d 329, 334

2   (9th Cir. 1992) (en banc), *cert. denied*, 113 S.Ct. 1600 (1993).  The court further issued jury

3   instructions on the elements of first and second degree murder.  (RT, Vol. 28, at 8123-8126).  The

4   jury was subsequently instructed that in order to return a guilty verdict against Petitioner they were

5   required to be "convinced beyond a reasonable doubt and unanimously agree that the crime of

6   murder was–has been committed by the defendant," and that unanimity was required on the degree

7   of murder as well.  (Id. at 8126-8127).  The trial court also instructed the jury that they could convict

8   Petitioner of a lesser crime provided they were satisfied beyond a reasonable doubt that he was guilty

9   of this crime and were not satisfied beyond a reasonable doubt that he was guilty of first degree

10  murder.  (Id. at 8127 and 8150).  The trial court also instructed the jury on the elements required to

11  convict Petitioner on the charge of attempted murder and conspiracy to commit murder, including

12  the admonition that "[t]he People have the burden of proof as this theory of criminal liability.  If you

13  have a reasonable doubt as to the this theory of liability...you must find defendant not guilty of the

14  crime charge."  (Id. at 8131).

15       Considering the numerous instructions charging the jury with finding that Petitioner

16  committed the elements of the crime beyond a reasonable doubt and the challenged jury instruction

17  specifically stated that evidence of flight was insufficient by itself to return a conviction, Petitioner

18  has failed to establish that the instruction so infected the entire trial that the issuance of the

19  instruction  violated his right to due process of the law.  *See* <u>Jeffries</u>, 988 F.2d at 938.

## 2.    *Ineffective Assistance of Counsel*

21       The state appellate court summarily rejected Petitioner's claim that his counsel provided

22  ineffective assistance in failing to object to the flight instructions on the grounds Petitioner advanced

23  in the above section.  As a result of the unexplained rejection, this Court conducts an independent

24  review of the record to determine whether the state court's decision was objectively unreasonable.

25  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th

26  Cir. 2000) (stating "[f]ederal habeas review is not de novo when the state court does not supply

27  reasoning for its decision, but an independent review of the record is required to determine whether

28  the state court clearly erred in its application of controlling federal law"); *see also*, <u>e.g.</u>, <u>Greene v.

1   Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002).

2        For the purposes of habeas cases governed by 28 U.S.C. § 2254 (d), the law governing

3   ineffective assistance of counsel claims is clearly established.  Canales v. Roe, 151 F.3d 1226, 1229

4   (9th Cir. 1998).  A petition for writ of habeas corpus, resting upon an allegation of ineffective

5   assistance of counsel, requires that the Petitioner establish two elements–(1) counsel' s performance

6   was deficient and (2) Petitioner was prejudiced by the deficiency.  Strickland v. Washington, 466

7   U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); United States v. Olson, 925 F.2d 1170, 1173 (9th Cir.

8   1991); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).

9        Under the first element, Petitioner must show that counsel's errors were so serious that he or

10  she effectively failed to function as the "counsel" guaranteed under the Sixth Amendment.

11  Strickland, 466 U.S. at 687.   Petitioner must establish that counsel's representation fell below an

12  objective standard of reasonableness, specifically identifying alleged acts or omissions which did not

13  fall within reasonable professional judgment considering the circumstances.  Id. at 688; United States

14  v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance

15  is highly deferential.  There exists a strong presumption that counsel's conduct fell within the wide

16  range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d

17  1446, 1456 (9th Cir. 1994).  Consequently, to prevail on the first prong, Petitioner must prove that

18  counsel's performance was unreasonable under prevailing professional norms.

19        Secondly, Petitioner must show that counsel's errors were so egregious that Petitioner was

20  deprived of the right to a fair trial, a trial whose result is reliable.  Strickland, 466 U.S. at 687.  The

21  court must evaluate whether the entire trial was fundamentally unfair or unreliable as a result of

22  counsel's deficient performance.  Lockhart v. Fretwell, 506 U.S. 364, 369, 113 S.Ct. 838 (1993);

23  Quintero-Barraza, 78 F.3 at 1345; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

24  More specifically, to prevail on the second element, Petitioner bears the burden of establishing that

25  there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the

26  proceeding would have been different.  A reasonable probability is a probability sufficient to

27  undermine confidence in the outcome."  Quintero-Barraza, 78 F.3d at 1348 (quoting Strickland, 466

28  U.S. at 694).

1    A court need not determine whether counsel's performance was deficient before examining

2  the prejudice suffered by the Petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at

3  697.  Since prejudice is a prerequisite to a successful claim of ineffective assistance of counsel, any

4  deficiency that was not sufficiently prejudicial to Petitioner's case is fatal to an ineffective assistance

5  of counsel claim.  Generally, ineffective assistance of  counsel claims are analyzed under the

6  "unreasonable application" prong of 28 U.S.C. § 2254(d) recognized in Williams v. Taylor 529 U.S.

7  362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1061-1062 (9th Cir. 2000).  Acknowledging that

8  Petitioner must establish that the state court's decision was an unreasonable application of clearly

9  established federal law, the Court now examines whether Petitioner has met his burden.

10    At the instruction conference, Petitioner's counsel objected to the jury instruction on other

11  grounds–specifically that there was insufficient evidence to warrant the instruction as there was little

12  or no evidence that Petitioner was at the scene of the crime and therefore that Petitioner fled the

13  crime scene.  (RT, Vol. 26, at 7547-7549).  As discussed above, the proposed grounds that Petitioner

14  contends trial counsel should have objected on was based upon an unpersuasive interpretation of the

15  jury instruction.  Therefore, counsel cannot be faulted for failing to object to the jury instruction on

16  sufficiency of the evidence rather than the grounds advanced by Petitioner here.  As the evidence was

17  sufficient to warrant the flight instruction, the issuance of the instruction was proper and Petitioner

18  has not demonstrated that counsel's performance was deficient nor that the failure to object

19  prejudiced Petitioner.  Accordingly, Petitioner has failed to establish a ground for relief.

20    **D.    Ground Five**

21    The petition alleges, as the fifth ground for relief, that the trial court erred in denying the

22  defense's proposed jury instruction on coercion as it related to evaluating a witness' statement.  The

23  state appellate court found that Petitioner's claim was without merit as the proposed instruction was

24  flawed as it would have required the jury to consider the question of coercion for every statement

25  made by a testifying witness.  (Lod. Doc. 3 at 32).  The appellate court further found that the trial

26  court's issuance of CALJIC No. 2.13 and 2.20 encompassed the aim of the proposed instruction.

27  The California Supreme Court summarily denied the petitioner for review, making the appelalte

28  court the last court to issue a reasoned opinion in this case.  As the California Supreme Court's

1  opinion is summary in nature, this Court looks through that decision and presumes that by its "silent

2  order" denying the petition, the California Supreme Court denied the claims presented for the same

3  reasons stated in the lower court's opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

4      In order to obtain federal habeas relief, a petitioner must show that the error "so infected the

5  entire trial that the resulting conviction violate[d] due process."  Henderson, 431 U.S. at 154

6  (quoting Cupp, 414 U.S. at 147).  The omission of a jury instruction, which might be proper as a

7  matter of state law, does not by itself merit federal habeas relief.  Menendez v. Terhune, 422 F.3d

8  1012, 1029 (9th Cir. 2005)(citing Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985)).  Petitioner's

9  counsel requested that the following instruction be issued:

10      If you find from the evidence that a statement was made by a witness, you must then
        determine if it was produced by means of coercion.  Although coercive methods do no
11      necessarily produce false statements, they certainly may have that effect.  Therefore, if
        you determine that coercion did occur, you should consider this fact in deciding the
12      weight and believability, if any, such statement should be given.

13  (Lod. Doc. 3 at 31, n. 11; also RT, Vol. 26, at 7590-7595)

14      As noted by the appellate court, two jury instructions had already informed the jury that they

15  could consider "anything that has a tendency to prove or disprove the truthfulness of the testimony of

16  the witness."  (RT, Vol. 28 at 8101).  Furthermore, the instruction explicitly pointed to "[t]he

17  existence or nonexistence of any bias, interest, or other motive," and "[w]hether the witness is

18  testifying under a grant of immunity" as factors in weighing the credibility of the witness.  (Id. at

19  8102).  As the issue of police coercion had already been established during Rodriguez's testimony,

20  these instructions would have been sufficient for a reasonable juror to conclude that they could have

21  considered coercion in evaluating a witness' credibility.  Consequently, the Court cannot say that the

22  failure to issue the instruction constituted an error so great that it infected the entire trial and that

23  Petitioner's conviction violated due process.  Thus, the state court's finding that this claim was

24  without merit was not an unreasonable application of clearly establish federal law.

25      **E.    Ground Six**

26      Petitioner's sixth ground for relief states, "the cumulative effect of the instructional errors

27  denied Appellant Due Process and a fair trial."  While no single alleged error may warrant habeas

28  corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair

1    trial.  <u>Karis v. Calderon</u>, 283 F.3 1117, 1132 (9th Cir. 2002); *see also* <u>Ceja v. Stewart</u>, 97 F.3d 1246,

2    1254 (9th Cir. 1996).   This claim must also be rejected because, as discussed above, there were no

3    constitutional errors to accumulate.  As Petitioner did not suffer prejudice as a result of any of the

4    alleged errors, Petitioner cannot establish cumulative prejudice by combining his claims into a group.

5         **F.        Ground Seven**

6         As his seventh ground for relief, Petitioner challenges his conviction on two counts of

7    attempted dissuasion of a witness (count seven and eight of the charge), in violation of California

8    Penal Code section 136.1(a)(2).  Petitioner contends that there exists insufficient evidence to support

9    those convictions.  These claims were presented to the state appellate court, the last court to issue a

10   reasoned opinion in this case.  The state supreme court denied the Petitioner's application for review

11   without comment.  As the California Supreme Court's opinion is summary in nature, this Court

12   looks through that decision and presumes that by its "silent order" denying the petition, the state

13   supreme court denied the claims presented for the same reasons stated in the lower court's opinion.

14   <u>Ylst</u>, 501 U.S. at  803.

15        As a preliminary matter, the Court notes that Petitioner's claim regarding count seven is

16   moot.  The state appellate court overturned Petitioner's conviction on count seven, finding that there

17   was insufficient evidence to support Petitioner's conviction for attempted witness dissuasion on that

18   count.  (Lod. Doc. 2 at 33-34).  Thus, Petitioner has already been provided his requested remedy on

19   that claim.

20        In reviewing sufficiency of evidence claims, California courts expressly follow the <u>Jackson</u>

21   standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  *See* <u>People v. Johnson</u>, 26 Cal.3d

22   557, 575-578 (Cal. 1980); *see also* <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (Cal. 1992).  Pursuant to

23   the Supreme Court's holding in <u>Jackson</u>, the test in determining whether a factual finding is fairly

24   supported by the record is as follows:

25        [W]hether, after viewing the evidence in the light most favorable to the
          prosecution, any rational trier of fact could have found the essential elements
26        of the crime beyond a reasonable doubt.

27   <u>Jackson</u>, 443 U.S. at 319; *see also* <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).

28        This Court must presume the correctness of the state court's factual findings.  28 U.S.C.

1   § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).  This presumption of correctness

2   applies to state appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v.

3   Borg</u>, 895 F.2d 520, 525 (9th Cir. 1990).  While the presumption of correctness does not apply to

4   state court determinations of legal questions or mixed questions of law and fact, the facts as found by

5   the state court underlying those determinations are entitled to the presumption.  <u>Sumner v. Mata</u>, 455

6   U.S. 539, 597 (1981).

7        The appellate court rejected Petitioner's claim that his conviction on count eight, regarding a

8   telephone conversation between Petitioner and Matt on August 23, 2001, was based on insufficient

9   evidence.  The appellate court stated that:

10            As pertinent here, it appears Martinez asked Matt to talk with Rodriguez's
         brother in an effort to get a message to Rodriguez. Martinez wanted someone to tell
11        Rodriguez that he (Martinez) was not "tripping" (upset), that all he wanted was to get
         out of jail and see his family. Martinez said Rodriguez could get him out of jail if he
12        went to the district attorney and recanted his story. Martinez indicated the only
         repercussion from Rodriguez's actions was that they would no longer be friends.
13            In this conversation Martinez attempted to convince Rodriguez to change his
         testimony. The conversation contains clear references to Rodriguez changing his
14        previous statements to the police. This is substantial evidence that Martinez was
         attempting to affect Rodriguez's testimony.
15   (Lod. Doc. )

16        Sufficiency claims are judged by the elements defined by state law.  <u>Jackson</u>. 443 U.S. at 324,

17   n. 16.  A violation of California Penal Code section 136.1(a)(2) requires specific intent to affect or

18   influence the testimony of a potential witness combined with the performance of an act that goes

19   beyond mere preparation.  <u>People v. McDaniel</u>, 22 Cal.App.4th 278, 284 (Cal. Ct. App. 1994);

20   <u>People v. Foster</u>, 155 Cal.App.4th 331, 335-336 (Cal. Ct. App. 2007) (citing <u>People v. Toledo</u>, 26

21   Cal.4th 221, 230 (Cal. 2001)).

22        As the appellate court noted, the conversation between Petitioner and Matt presents

23   substantial evidence of the intent to affect or influence Rodriguez's testimony.  (*See* CT 1668-1679).

24   During the conversation, Petitioner asked Matt to relay to Rodriguez that he (Rodriguez) could get

25   Petitioner out of jail by recanting his story to the police.  (CT at 1672).  In attempting to get

26   Rodriguez to recant his statement, the conversation explicitly evidences Petitioners' specific intent to

27   influence or affect the testimony of a potential witness.  In asking Matt to relay this message,

28   Petitioner has committed an act beyond mere preparation.  *See* <u>Foster</u>, 155 Cal.App.4th at 336-337

(finding that solicitation of a thirty party to pass along message to witness went beyond mere preparation and thus qualified as the act requirement for violating Cal. Penal Code § 136.1(a)(2)). Petitioner's contention that the evidence supporting his conviction was insufficient must be rejected as being without merit.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:      December 12, 2008                       /s/ John M. Dixon
                                         UNITED STATES MAGISTRATE JUDGE